# EXHIBIT A

NYSCEF - New York State Courts Electronic Filing (Live System)

<< *Return to* **Search Results**

---

**802742/2022E -** Bronx County Supreme Court

---

Short Caption: **Karille Ormsby v. Cayuga Centers**
Case Type: **Torts - Other (Labor Law Violations)**
Case Status: **Pre-RJI**
eFiling Status: **Full Participation Recorded**

E-mail Participating Parties

**Narrow By Options**

| Document Type: | Please select... | | Filed By: | |
| --- | --- | --- | --- | --- |
| | Please select... | | | |
| Motion Info: | | | Filed Date: | |
| | | thru | | |
| Document Number: | | | | |

Display Document List with Motion Folders 📁

---

Sort By: Doc #

| # | Document | Filed By | Status |
| --- | --- | --- | --- |
| 1 | SUMMONS WITH NOTICE | Goddard, M.<br>Filed: 02/18/2022<br>*Received: 02/18/2022* | **Processed**<br>Confirmation Notice |
| 2 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>*Service of Summons with Notice on Defendant* | Goddard, M.<br>Filed: 06/21/2022<br>*Received: 06/21/2022* | **Processed**<br>Confirmation Notice |
| 3 | DEMAND FOR COMPLAINT<br>*Demand for Service of the Complaint* | Healy, S.<br>Filed: 06/22/2022<br>*Received: 06/22/2022* | **Processed**<br>Confirmation Notice |
| 4 | STIPULATION - OTHER<br>*Stipulation Extending Time to File Complaint* | Goddard, M.<br>Filed: 07/05/2022<br>*Received: 07/05/2022* | **Processed**<br>Confirmation Notice |
| 5 | STIPULATION - OTHER<br>*Stipulation Extending Time to File Complaint* | Goddard, M.<br>Filed: 08/10/2022<br>*Received: 08/10/2022* | **Processed**<br>Confirmation Notice |
| 6 | SUMMONS WITH NOTICE (FEE PREVIOUSLY PAID) | | *Returned For Correction* |
| 7 | COMPLAINT | Goddard, M.<br>Filed: 08/25/2022<br>*Received: 08/25/2022* | **Processed**<br>Confirmation Notice |

Case 1:22-cv-07663-JHR   Document 1-1   Filed 09/08/22   Page 3 of 45

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**
-------------------------------------------------------------------x

**KARILLE ORMSBY,**

                                **Plaintiff,**

        -against -

**CAYUGA CENTERS,**

                                **Defendant.**

-------------------------------------------------------------------x

Index No.:

**<u>SUMMONS WITH NOTICE</u>**

**<u>VENUE</u>**
Bronx County

**<u>BASIS OF VENUE</u>**
Defendant's Place of Business

**TO THE ABOVE-NAMED DEFENDANT(S):**

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney, at

the address stated below, a notice of appearance or demand for a complaint.

    If this Summons with Notice was personally served upon you in the State of New York,

the notice of appearance or demand for complaint must be served within twenty (20) days after

such service of the Summons with Notice, excluding the date of the service. If this Summons with

Notice was not personally delivered to you within the State of New York, the notice of appearance

or demand for complaint must be served within thirty (30) days after service of this Summons with

Notice is completed as provided by law.

    **PLEASE TAKE NOTICE THAT** the nature of this action is labor law violations of the

New York Labor Law § 740, New York's anti-retaliation and whistleblower protection law.

    The relief sought is: an amount to be determined at trial but in no event less than One

Million Five Hundred Thousand Dollars ($1,500,000.00) together with attorneys' fees and interest

thereon.

    **PLEASE TAKE FURTHER NOTICE** that if you do not serve a notice of appearance or

demand for a complaint within the applicable time limitation stated above, a judgment will be

1

entered against you, by default, for the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) together with interest, attorneys' fees and the costs and disbursements of this action.

The action will be heard in the Supreme Court of the State of New York, in and for the County of the Bronx. The basis for the venue is Defendant's place of business.

**Dated: New York, New York**
**February 18, 2022**

**GODDARD LAW PLLC**
*Attorneys for Plaintiff*

**By:** */s/ Megan S. Goddard*
**Megan S. Goddard, Esq.**
**39 Broadway, Suite 1540**
**New York, New York 10006**
**(646) 504-8363**
**Megan@goddardlawnyc.com**

**TO:    CAYUGA CENTERS**
**2417 Third Avenue, Suite 701**
**Bronx, New York 10451**

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

KARILLE ORMSBY

Plaintiff(s)

- against -

CAYUGA CENTERS

Defendant(s)

The papers served bore the index # and date of filing.

Index # 802742/2022E

Purchased February 18, 2022

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK: COUNTY OF NEW YORK ss:

BYRAN E. MCELDERRY BEING DULY SWORN DEPOSES AND SAYS DEPONENT IS NOT A PARTY TO THIS ACTION, OVER THE AGE OF EIGHTEEN YEARS AND RESIDES IN THE STATE OF NEW YORK.

That on June 10, 2022 at 05:03 PM at

2417 3RD AVENUE, STE. 701
BRONX, NY 10451

deponent served the within SUMMONS WITH NOTICE WITH NOTICE OF ELECTRONIC FILING (MANDATORY) on CAYUGA CENTERS therein named.

BY LEAVING A TRUE COPY WITH KARLA REYES, RECEPTIONIST, BEING AUTHORIZED TO ACCEPT LEGAL PAPERS STATED.

Deponent further states that he describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Age (Approx.) | Height (Approx.) | Weight (Approx) |
|---|---|---|---|---|---|
| FEMALE | BROWN | BROWN | 28 | 5'5 | 130 |

**MAILING**   Deponent enclosed a copy of same in a postpaid wrapper properly addressed to the Defendant at the Defendant's actual place of business at

2417 3RD AVENUE, STE. 701
BRONX, NY 10451

and deposited said wrapper in a post office or official depository under exclusive care and custody of the United States Postal Service within New York State on June 17, 2022 by REGULAR FIRST CLASS MAIL in an envelope marked PERSONAL & CONFIDENTIAL and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the entity to be served.

Sworn to me on:  June 16, 2022

JOSEPH KNIGHT
Notary Public, State of New York
No. 01KN6178241
Qualified In New York County
Commission Expires November 26, 2023

VINETTA BREWER
Notary Public, State of New York
No. 01BR4949206
Qualified in Bronx County
Commission Expires April 3, 2023

JOEL GRABER
Notary Public, State of New York
No. 02GR4699723
Qualified in New York County
Commission Expires February 10, 2026

BYRAN E. MCELDERRY
License #: 869802

Invoice #: 787058

UNITED PROCESS SERVICE, INC., 225 BROADWAY, SUITE 440, NEW YORK, NY 10007 - (212) 619-0728 NYCDCA#1102045

Case 1:22-cv-07663-JHR   Document 1-1   Filed 09/08/22   Page 6 of 45

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X   Index No.: 802742/2022E
KARILLE ORMSBY,

                         Plaintiff,

**DEMAND FOR
SERVICE OF THE
COMPLAINT**

      -against-


CAYUGA CENTERS,

                       Defendant.

-------------------------------------------------------------------X

**C O U N S E L O R S :**

     **PLEASE TAKE NOTICE** that defendant hereby demands pursuant to New York Labor Law §740, New York's anti-retaliation and whistleblower protection law, that you serve a copy of the complaint upon the undersigned attorney within twenty (20) days after due service of this demand upon you, at the office and post office address stated below.  This demand does not constitute an appearance by the defendant.  In the event that you fail to serve the demand within twenty (20) days, a motion will be made to dismiss the action.


Dated: White Plains, New York
       June 22, 2022              KAUFMAN DOLOWICH & VOLUCK, LLP

                            By:_____
                            Siobhan Healy, Esq.
                            Attorneys for Defendants
                            CAYUGA CENTERS
                            245 Main Street, Suite 330
                            White Plains, New York 10601
                            (914) 470-0001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------x
KARILLE ORMSBY,

                                    Plaintiff,

                -against -

CAYUGA CENTERS,

                                    Defendant.
------------------------------------------------------------------x

Index No.: 802742/2022E

**STIPULATION EXTENDING
<u>TIME TO FILE COMPLAINT</u>**

**IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel that:

1.      Plaintiff's time to file her Complaint shall be extended from July 12, 2022, to August 11, 2022.

        **IT IS FURTHER STIPULATED AND AGREED**, that this Stipulation may be executed in counterparts and such counterparts together shall constitute the entire Stipulation. Fax/email signatures shall be deemed originals.

**Dated: New York, New York
        July 5, 2022**

GODDARD LAW PLLC

_____
Megan S. Goddard, Esq.
Juliet Critsimilios, Esq.
39 Broadway, Suite 1540
New York, NY 10006

*Attorneys for Plaintiff Karille Ormsby*

KAUFMAN DOLOWICH VOLUCK

_____
Siobhan Healy, Esq.
245 Main Street, Suite 330
White Plains, New York 10601

*Attorneys for Defendant Cayuga Centers*

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------x
KARILLE ORMSBY,

                           Plaintiff,

         -against -

CAYUGA CENTERS,

                          Defendant.
------------------------------------------------------------------x

Index No.: 802742/2022E

**STIPULATION EXTENDING**
**TIME TO FILE COMPLAINT**

**IT IS HEREBY STIPULATED AND AGREED,** by and between the undersigned counsel that:

1.    Plaintiff's time to file her Complaint shall be extended from August 11, 2022, to

August 25, 2022.

       **IT IS FURTHER STIPULATED AND AGREED,** that this Stipulation may be executed

in counterparts and such counterparts together shall constitute the entire Stipulation. Fax/email

signatures shall be deemed originals.

**Dated: New York, New York**
        **August 9, 2022**


GODDARD LAW PLLC

_____
Megan S. Goddard, Esq.
Juliet Critsimilios, Esq.
39 Broadway, Suite 1540
New York, NY 10006

*Attorneys for Plaintiff Karille Ormsby*


KAUFMAN DOLOWICH VOLUCK

_____
Siobhan Healy, Esq.
245 Main Street, Suite 330
White Plains, New York 10601

*Attorneys for Defendant Cayuga Centers*


1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

-------------------------------------------------------------------x

KARILLE ORMSBY,

         **Plaintiff,**

    -against -

CAYUGA CENTERS,

         **Defendant.**

-------------------------------------------------------------------x

**Index No.: 802742/2022E**

**<u>COMPLAINT</u>**

*Jury Trial Demanded*

   Plaintiff KARILLE ORMSBY ("Plaintiff"), by her attorneys, GoddardLaw PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, as and for her Complaint, alleges, upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

<u>**PRELIMINARY STATEMENT**</u>

   1.  Plaintiff brings this action based upon the unlawful discrimination and retaliation that Plaintiff experienced while being employed by Defendant Cayuga Centers (hereinafter "Defendant Cayuga Centers") in violation of the New York Labor Law's ("NYLL") provisions §740, §741 and NYLL §215, the New York State Human Rights Law, the New York City Human Rights Law, the Equal Pay Act, the New York State Equal Pay Act, and 42 U.S.C. § 1981.

<u>**JURISDICTION AND VENUE**</u>

   2.  Jurisdiction of the Court over this controversy is based upon C.P.L.R. §§ 301 and 302, because Defendants are located in New York, and/or are transacting business in Bronx, New York and because the majority of events happened in Bronx, New York.

   3.  Venue is proper pursuant to N.Y. C.P.L.R. § 503 because Defendant Cayuga Centers maintains offices at 2417 Third Avenue, Suite 701, Bronx, NY 10451.

1

## **PARTIES**

4.      At all times relevant to the claims in this action, Plaintiff was a resident of Albany County, New York.

5.      At all relevant times, Plaintiff was an "employee" of Defendant Cayuga Centers within the meaning of all relevant statutes.

6.      Defendant Cayuga Centers is a domestic not-for-profit corporation organized and existing under the laws of the State of New York and authorized to do business in the state of New York. Defendant Cayuga Centers maintains its principal place of business at 101 Hamilton Street, Auburn, New York and is authorized to operate within at least 60 counties of the State of New York. At all relevant times, Defendant Cayuga Centers was an "employer" under all applicable statutes.

## **INTRODUCTION**

### **Defendant Cayuga Centers Prioritizes Profit Before Employee Safety**

7.      Throughout the historic COVID-19 pandemic, Defendant Cayuga Centers repeatedly and persistently failed to comply with its obligation to institute reasonable and adequate measures to protect its workers from the spread of the virus. Defendant Cayuga Centers' flagrant disregard for health and safety requirements has threatened serious illness and grave harm to their multiple employees and posed a continued substantial and specific danger to the public health.

8.      When employees began to object to Defendant Cayuga Centers' dangerous and unlawful practices and made complaints to its management, Defendant Cayuga Centers retaliated against and silenced workers' complaints.  Defendant Cayuga Centers terminated Plaintiff and other employees who voiced their complaints.

9.      Defendant Cayuga Centers' actions against their staff, who simply wanted the

2

safety they were entitled to, created a chilling effect on the rest of its employees.

10.     Upon information and belief, Defendant Cayuga Centers' response to the pandemic continues to be deficient.

### Defendant Cayuga Center Discriminates Against Women of Color, and Engages in Unlawful Pay Practices

11.     Defendant Cayuga Center maintains a hostile and discriminatory environment for people of color; Specifically, for women of color, and engages in unequal pay and promotion practices and regularly violates the NYLL and FLSA by forcing employees to work overtime without compensation.

### FACTUAL ALLEGATIONS

### The COVID-19 Pandemic

12.     COVID-19 is an infectious respiratory disease caused by a novel Coronavirus. COVID-19 can result in serious, long-term health complications and has resulted in over one million reported deaths in the United States to date[1]. Among these serious health complications, COVID-19 can cause inflammation in the lungs, shortness of breath or difficulty breathing, clogging the air sacs in the lungs, limiting the body's oxygen supply and blood clots, organ damage to the heart, kidneys, skin and brain, organ failure, heart inflammation, problems with the liver, and neurological malfunction.[2]

13.     COVID-19 is highly contagious and of course spread is more likely when people are in close contact with one another (within about 6 feet for longer than a total of 15 minutes during a 24-hour period).

---

[1] https://coronavirus.jhu.edu/
[2] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html; *see also*:
https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351

3

14.     The virus can be spread even by people who are "asymptomatic," "pre-symptomatic" or very mildly symptomatic, meaning they feel unwell but often do not realize they have the virus.

15.     Research from the U.S. Centers for Disease Control and Prevention ("CDC") suggests that a single person with COVID-19 is likely to infect five or six other individuals absent aggressive social distancing practices.  According to the CDC, the best way to prevent illness is to avoid exposure to this virus.

16.     New York's first confirmed case of COVID-19 was announced on March 1, 2020.

17.     New York State then became the global epicenter of the pandemic, and as of February 14, 2021, New York reported over 50,000 reported deaths due to COVID-19.

### New York State and Albany County Enact Rules and Regulations in Response to the COVID-19 Outbreak to Protect Employees

18.     In March 2020, New York State instituted requirements and issued guidance to protect the health and safety of workers, as well as the public, against infection by COVID-19 and to minimize deaths, illness, and other devastating impacts of the virus.

19.     On March 3, 2020, the New York State Legislature amended Executive Law § 29-a effective immediately to authorize the Governor, in disasters including epidemics and disease outbreaks, to issue "any directive… necessary," including "procedures reasonably necessary to enforce such directive." *See* Ch. 23, N.Y. Laws 2020, § 2, eff. March 3, 2020. The broadened Executive Law § 29-a remained in effect for over a year until the Legislature restored "the pre-pandemic balanceof power of the governor and legislature, . . . while maintaining the authority of public-health focused directives taken by the Governor" and providing for extension of previously issueddirectives. *See* Ch. 71, N.Y. Laws 2021, eff. March 8, 2021.

20.     On March 7, 2020, Governor Cuomo issued Executive Order 202 declaring a

4

disaster emergency.

21.     On March 14, 2020, the County of Albany declared a State of Emergency due to COVID-19.

22.     On March 16, 2020, the New York State Department of Health ("DOH") issued an "Interim Guidance for Home Care Services Regarding COVID-19," which applies to Defendant Cayuga Centers' home care services. This guidance included a questionnaire that providers should use before physical home-based services are provided.

23.     On March 18, 2020, Governor Cuomo issued Executive Order 202.6 curtailing non-essential in-person work at New York businesses and committing authority to the Empire StateDevelopment Corporation ("ESD") to issue guidance as to which businesses are determined to be essential. On March 20, 2020, he issued Executive Order 202.8, the "New York State On PAUSE" Executive Order ("NYSOP"), which included a 10-point plan, requiring all non-essential businesses in New York State to be closed effective 8:00 p.m. on March 22, 2020, and announcing social distancing requirements for essential businesses.

24.     The earliest version of its guidance pursuant to EO 202.6, published on March 20, 2020, ESD required, "Essential Businesses must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the Department of Health."

25.     On March 27, Governor Cuomo issued Executive Order 202.11 making "[a]ny guidance issued by the New York State Department of Health related to prevention and infection control of COVID-19 . . . effective immediately."

26.     On May 14, 2020, Governor Cuomo issued Executive Order 202.31 ("EO 202.31") authorizing a phased re-opening of non-essential businesses in accordance with DOH-prescribed metrics in designated regions of the state, provided that essential businesses that had remained

open as well as non-essential businesses that were re-opening were required to continue to operate "subject to the guidelines promulgated by the Department of Health." *See* EO 202.31.

27.    Pursuant to EO 202.31, DOH promulgated detailed guidelines which included industry-specific guidelines, applicable "to both non-essential businesses in regions that are permitted to re-open and essential businesses throughout the state that were previously permitted to remain open."

28.    On June 18, 2020, the DOH issued new detailed guidelines named "Home and Community-Based Services Regarding COVID-19," which was an update to its March 16, 2020, guidance titled "Interim Guidance for Home Care Services Regarding COVID-19."[3] This regulation required home and community-based services providers such as Defendant Cayuga Centers to opt for remote services wherever possible and to follow the following strategies to prevent the spread of COVID-19:

- "Implement daily health screenings for staff: Home care services staff experiencing symptoms consistent with COVID-19, exposed in the last 14 days to a COVID-19 positive individual, testing positive for COVID-19 in the last 14 days, or experiencing a temperature greater than or equal to 100.0° F, should not enter a client's home or the workplace. Staff who develop symptoms consistent with COVID-19 should stay home, contact their health care provider, and find a local testing site for diagnostic testing. Information about when staff, who had symptoms of COVID-19 or had a COVID-19 test that was positive, can return to work are outlined in the May 31, 2020 "Interim Guidance for Public and Private Employees Returning to Work Following COVID-19 Infection or Exposure".

- "Personal Protective Equipment (PPE): Consistent with directives from Governor Andrew M. Cuomo, including Executive Orders 202.16 and 202.17, as subsequently extended, the NYS Department of Health requires the wearing of a face covering when unable to maintain social distance. Executive Order 202.16, issued on April 12, 2020, further provides: "For all essential businesses or entities, any employees who are present in the workplace shall be provided and shall wear face coverings when in direct contact with customers or members of the public."

[3]https://www.health.ny.gov/community/infants_children/early_intervention/docs/doh_covid19_homecare_services_update.pdf

6

Individuals are required to wear a face covering in situations and settings where social distance of 6 feet is not possible. Face coverings are not required if wearing one would inhibit or otherwise impair an individual's health. Children under the age of two are not required to wear a face covering. Staff should work with their agency to obtain PPE. If agencies have questions about PPE, they should contact the local health department."

- "Hand Hygiene: Home care services providers should perform frequent hand hygiene. Hands should be washed with soap and water for at least 20 seconds before and after all individual contact, after contact with potentially infectious material, and before putting on and after removing PPE, including facemask and gloves. Hand hygiene after removing PPE is particularly important, to get rid of any germs that might have been transferred to bare hands during the removal process. If soap and water are not immediately available, an alcohol-based hand sanitizer containing at least 60% alcohol, may be used. Please note, soap and water should be used if hands are visibly dirty."

- "Maintain physical distance: To the greatest extent possible, a physical distance of at least 6 feet should be maintained when inside the home. If the services being delivered do not allow for physical distance, PPE should be used and good hand hygiene must be practiced.

29.     Additional local, state, and/or federal laws, regulations, and/or guidance in relation to COVID-19 may have been applicable to Defendant Cayuga Centers at that time and until Plaintiff's unlawful termination.

**Plaintiff is Hired by Defendant Cayuga Centers as an Assistant Director**

30.     Plaintiff is a Licensed Social Worker with over 20 years of work experience in the field of child welfare.

31.     In or around June 2020, Plaintiff was hired by Defendant Cayuga Centers as "Assistant Director" for Therapy and Case Management.

32.     Plaintiff was hired at a salary of $60,000.

33.     Defendant Cayuga Centers is a non-profit agency that provides various mental health services to families, including in-home counseling to help children with behavioral problems.

7

34. Plaintiff worked in the Functional Family Therapy Program (FTT), which is an intensive, short-term therapeutic model that offers in-home family counseling designed specifically to address the referring behaviors (i.e., curfew violations, running away, and truancy) and juvenile delinquency from a relational, family-based perspective. The goal of this program is to improve family relationships.

### Plaintiff Is Warned That Defendant Cayuga Center is Racist

35. Soon after Plaintiff started, a female co-worker of color warned her that as a Black woman, she "should be careful because [Defendant Cayuga Center] likes to fire Black people for no reason." She then gave Plaintiff multiple examples of employees of color who had been fired for things that white employees had not been fired for.

### Plaintiff Witnesses Unequal Treatment and Scrutinization of Employees of Color

36. Thereafter, Plaintiff noticed that there was a difference in the way that employees of color were treated as opposed to white employees. Specifically, she observed that employees of color were scrutinized more closely than white employees and subjected to extensive tone policing, whereas white employees were able to voice their thoughts and opinions without fear of reprisal. Specifically, Plaintiff noticed that each time she spoke up about troubling issues with Defendant's minor clients, she was quickly criticized for being "aggressive," told to keep her mouth shut and told not to speak up.

37. Upon information and belief, Defendant preferred the thoughts, ideas, and opinions of white employees.

### Plaintiff Realizes she is Being Underpaid

38. Although Plaintiff had been hired at a salary of $60,000, she realized after a few months that she was only being paid $57,000.

39. Plaintiff also discovered that her white counterpart was making more money than

8

she was.  Upon information and belief, Charging Party was underpaid compared to white female employees and especially to white male employees.

**Plaintiff's Direct Supervisors are Directly in Charge of Adherence to COVID Protocols**

40.     Plaintiff's direct supervisor at the time of her hiring was Assistant Vice President Amanda Ricciardi ("VP Ricciardi"). VP Ricciardi was Plaintiff's supervisor and/or had supervisory authority over Plaintiff, including the ability to hire, fire, and/or affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

41.     Shortly after Plaintiff started her role, VP Ricciardi was replaced by Rhonda Jones ("AVP Jones"). At all relevant times, AVP Jones was Plaintiff's supervisor and/or had supervisory authority over Plaintiff, including the ability to hire, fire, and/or affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

42.     Assistant Vice Presidents were responsible for oversight of the branch and ensuring that their clients' needs were being met. During COVID-19, they were also responsible for ordering Personal Protective Equipment (hereinafter "PPE") and making sure that COVID-19 guidelines were being followed.

**Defendant Cayuga Forces its Employees to Visit Clients in Person During the Pandemic**

43.     Plaintiff supervised and oversaw a team of four employees.  Plaintiff and her entire team provided services to patients in their homes.

44.     Two of these employees, Shakeera Glass ("HRC Glass") and Shuruq Moftah ("HRC Moftah"), oversaw behavioral change therapy, which required them to teach children new skills, provide support to clients who had mental health disabilities, and work directly with families, requiring them provide in-person services, usually inside a family's home.

45.     The other two employees, Alexander Bagdovitz ("LRC Bagdovitz") and Danielle Gonzalez ("LRC Gonzalez"), handled the organization's outreach efforts and provided resources

9

Case 1:22-cv-07663-JHR   Document 1-1   Filed 09/08/22   Page 18 of 45

to families.

### Defendant Cayuga Centers Fails to Implement a COVID-19 Policy and Protect Employees from Exposure

46.     At the time of Plaintiff's hiring, Defendant Cayuga Centers had their offices at full capacity. Upon information and belief, approximately 17 people were working out of the office where Plaintiff worked-and many of those employees were travelling in and out of patient homes, with the constant threat of exposure.

47.     Upon information and belief, Defendant Cayuga Centers could have operated with a significant number of staff working remotely-both by allowing staff to work from home and by allowing certain services to be offered on-line, but Defendant Cayuga Centers chose to disregard the DOH regulation to opt for remote services wherever possible.

48.     While some client families wore masks and did their best to mitigate the effects of COVID-19, others did not. Defendant Cayuga Centers did not have a COVID-19 policy that required client families receiving in-person services to ensure the safety of Defendant Cayuga Centers' staff while they provided services, either by implementing a policy to avoid dangerous in person sessions, or by failing to require client families to wear masks while working in person with Defendant Cayuga Centers' staff. Their lack of effective policies exposed Defendant Cayuga Centers' employees to families who were not wearing masks, who possibly had COVID-19 symptoms or who were exposed to COVID-19, with no means of redress to ensure their own safety while at work.

49.     Plaintiff feared for her safety due to her employer's very limited policies protecting her and her co-workers against COVID-19.

10

**Defendant Cayuga Centers' CEO Continues to Ignore Dangerous Gaps in COVID-19
Safety Protocol**

50.     Of course, given the lack of safety and the demands that so much work happen in person, Covid infections were rampant amongst Defendant Cayuga Centers' staff. The employees hoped that the rampant infections would cause Defendant Cayuga Center to see the error of their ways and stop placing its employees (and its clients) in such dangerous situations, but shockingly, Defendant Cayuga Centers' CEO Edward Hayes (hereinafter "CEO Hayes") instead openly blamed the employees non-work activities as the root of the Covid spread.

51.     On or about June 26, 2020, CEO Hayes sent an all-staff email outlining Defendant Cayuga Centers' adherence to COVID-19 protocols.

52.     In the email, CEO Hayes stated that wearing masks was a "basic courtesy" to keep one another safe and that "we have the responsibility to protect others."

53.     CEO Hayes also stressed the importance of wellness checks, social distancing, washing hands, and wearing masks. CEO Hayes stated that "at work doing these are not a choice but a requirement."

54.     Notably, CEO Hayes' email did not mention any thing about the employees who were forced to work outside of the office in client homes.

55.     Plaintiff was shocked that CEO Hayes continued to abdicate his responsibility to protect his employees from COVID-19 by continuing to have no protocols for staff who worked both outside and inside the office.

56.     Plaintiff and her coworkers lived in constant fear of being exposed to the virus at the homes of unmasked clients, and spreading it to their loved ones.

11

**Defendant Cayuga Makes Its Employees Go to-and stay in-Dangerous In- Home Visits
<u>Because It Can Charge More Money for In-Person Visits</u>**

57.    As Plaintiff continued working at Defendant Cayuga Centers, she noticed even more alarming gaps in Defendant Cayuga Centers' COVID-19 safety protocols.

58.    In accordance with Defendant Cayuga Centers' protocol in place at the time, when situations arose where client families had been exposed, or were worried about their potential of exposure, the families were supposed to email Defendant Cayuga Centers' Safety and Risk Director, AVP Jones, and Plaintiff, and provide details about their potential exposure.

59.    After learning about each situation, the Safety and Risk Director either instructed employees to conduct two weeks of virtual meetings and phone calls or deemed the risk of exposure "minimal."

60.    Upon information and belief, this protocol was often followed at random and was significantly flawed, making employees feel extremely uncomfortable going to work in families' homes when those families had been exposed or potentially exposed to COVID-19.

61.    Upon information and belief, the Safety and Risk Director regularly disregarded high risk of exposure.

62.    Upon information and belief, the Safety and Risk Director regularly sent employees to homes of families who experienced a secondary exposure, or who were unsure about their exposure status. Essentially, the Safety and Risk Director-long before vaccines were available, always disregarded secondary exposure and only noted any risk if there was reported direct contact.

63.    This policy confused and frightened Plaintiff and her team, as they frequently were forced to meet with these families and risked exposure not only to themselves and their coworkers but also to their other clients and their own families.

12

64.    Even though virtual meetings and phone calls were an option, Defendant Cayuga Centers still frequently made their employees risk their health, and the health of their clients, to meet with families in person.

65.    Upon information and belief, and unbeknownst to their employees at the time, Defendant Cayuga Centers pushed for in person visits even with risks to clients and employees because in person visits yielded a higher insurance payment to Defendant Cayuga Centers than virtual visits.

66.    It was often the case that when employees arrived at the home of a client, clients were unmasked and/or appeared to have COVID-like symptoms. Yet, Defendant Cayuga Centers did not allow its employees to leave the session, even when they were terrified they were being exposed to a highly contagious and deadly disease.

67.    Upon information and belief, Defendant Cayuga Centers only cared about obtaining the highest reimbursement amount it could-which required an in person visit.

68.    Defendant Cayuga Centers' employees were not only concerned about the risks to themselves, but also the risks of spreading COVID-19 to their other clients since the employees traveled from house to house and made contact with several different clients on a daily basis.

**CEO Hayes Threatens Employees Via Text About COVID-19 Safety Policies but Is Silent About COVID-19 Safety Policies to Protect Team Members Working with the Public**

69.    On or about June 30, 2020, Plaintiff received a text message from CEO Hayes regarding COVID-19 safety protocols in the office.

70.    In his message, CEO Hayes stated that moving chairs to sit close to other staff was a violation of COVID-19 protocols. He further stated that if staff was seen moving furniture, taking actions that violated social distancing measures, or wearing a mask improperly, they would be sent home.

13

71.    CEO Hayes went on to state a second violation would result in a 40-hour suspension and a third violation would lead to termination; specifically: "The third time you do this, you will be fired."

72.    CEO Hayes went on to state "if you get mouthy when we are imposing one of these disciplines, you will be terminated immediately...get it together or please do not come to work tomorrow." Upon information and belief, this text message was sent to all of Defendant Cayuga Centers' staff who were working either in the office or with members of the public.

73.    This text message referenced safety protocols within the office but, again, made no mention of safety protocols for employees forced to do at home visits, nor did it outline safety protocols for staff members who had interactions with the public.

**CEO Hayes Sends Another Nasty Email About COVID-19 Safety Protocols, Once Again Ignoring Plaintiff and Her Team**

74.    On or about June 30, 2020, CEO Hayes sent an email with similar language to his text message about adherence to COVID-19 safety protocols to all staff, in which he went out of his way to highlight that Defendant Cayuga Centers provided staff with "16 weeks of extra pay, at a cost of $13 million, so everyone received full pay during the various stay-at-home orders."

75.    CEO Hayes further stated that Defendant Cayuga Centers had taken many steps to keep their staff safe, including "screening all staff and visitors every day" and "providing masks and other Personal Protective Equipment (hereinafter "PPE") to staff at no charge."

76.    The email from CEO Hayes went on to state that "If you cannot act responsibly, you cannot be here. At Cayuga Centers, we take COVID-19 deadly seriously because it is deadly. Too many of you are acting foolishly and thereby risking the health of our staff." The email went on to state that staff were "acting foolishly" by: "moving your chairs from its designated spot to sit close to other staff; violating elevator capacity, room capacity, and other social distancing rules;

14

wearing your mask improperly – not making sure both your nose and mouth are covered; pulling

down your mask often or just wearing it around your neck."

77.    Once again, this email only discussed and highlighted the importance of preventing

in office exposure, yet failed to address and disregarded the risks associated with staff being forced

into Patient Family Homes.

78.    Of course, forcing staff to be exposed to individuals with COVID-19 symptoms or

prior exposure at in-person visits was far more dangerous than minor violations of the strict office

protocols, and yet Defendant Cayuga Centers displayed no concern for that exposure.

79.    Plaintiff and her team felt afraid and demoralized. They were not allowed to ensure

their own safety while working with the public outside of the office, but they were threatened swift

repercussions, including termination, for failing to follow COVID-19 safety protocols inside the

office.

80.    Upon information and belief, CEO Hayes deliberately avoided discussing or

creating protocols for in-person visits in order to maximize the number of in-person home visits

and thus maximize profit.

## CEO Hayes Sends Another Email Asking Staff for Feedback and Concerns

81.    On or about July 2, 2020, CEO Hayes sent yet another email admonishing people

for failing to follow COVID-19 safety protocols.

82.    In the email, CEO Hayes acknowledged that there had been an increase in infection

trends in New York State.

83.    CEO Hayes also asked staff to come to him with questions about COVID-19 safety

protocols; specifically, asking for "your feedback about some of the steps we have taken – a few

of which I'm sure are very unpopular."

15

84.     CEO Hayes also asked for "suggestions for other steps we might take" and "your insight into staff needs." CEO Hayes said that there would be an upcoming "Town Hall" style meeting where he would address these concerns.

**Plaintiff Attends the Town Hall Where CEO Hayes Is Openly Hostile to Staff Feedback**

85.     On or about July 16, 2020, CEO Hayes held a meeting to address questions, comments and concerns from staff about Defendant Cayuga Centers' COVID-19 policies.

86.     During the meeting CEO Hayes stated, in sum and substance, that Defendant Cayuga Centers had paid their staff during work from home orders and that everyone should be more appreciative of all Defendant Cayuga Centers had done and should do what he said moving forward without questioning it. Because of his push for appreciation as opposed to constructive feedback, Plaintiff did not bring up her concerns about the lack of COVID-19 policies. Upon information and belief, other staff were too afraid to bring up real concerns because of CEO Hayes' comments during the meeting.

87.     Plaintiff felt nervous to report any concerns she or her staff may have because of CEO Hayes' reaction during the meeting; further, CEO Hayes' made it clear that his priority was to recoup the money paid to staff during the peak of the pandemic rather than the safety and security of his staff in the field.

**CEO Hayes Sends An Additional All Staff Email Changing The Mask Directive**

88.     On or about July 9, 2020, CEO Hayes sent yet another email expressing the importance of masks.

89.     In his email, CEO Hayes wrote "to be clear, as of now we **are changing our MASK directive.** This new directive overrides the previous ones. Effective immediately, **you are required to wear a mask when on Cayuga Centers' premises unless you are in a room with a closed door by yourself**…Sadly, we sent 3 staff members home today for violating the attached

16

email. Please do not force us to send you home tomorrow." (Emphasis original).

90.     Plaintiff could not understand how the man who forced employees to go into any client home, regardless of mask wearing, exposure or risk, could be so careful at the office he himself worked in.

## CEO Hayes Sends Another Email, Finally Acknowledging Staff That Work Off-Site

91.     On or about July 10, 2020, CEO Hayes sent another email about COVID-19 protocols.

92.     This was the first email CEO Hayes sent that acknowledged Plaintiff and Plaintiff's team, specifically stating: "I am grateful to all our foster care staff who on a daily basis supported our foster children and foster parents – often remotely but often by going into foster homes at all hours of the day and night. I am grateful for our Community-Based intervention staff and our Behavior Health Support Services staff who continued to serve families – often in their homes – to continue treatment."

93.     CEO Hayes also stated: "I promise to not turn away from difficult questions...**asked questions produce answers** and **unasked questions generate nothing useful.** Your questions help all of us – so let them be heard." (Emphasis original).

94.     Plaintiff and her team were once again shocked by the discrepancy. CEO Hayes acknowledged their hard work and in-person services as the backbone of Defendant Cayuga Centers' work, but CEO Hayes did not want to ensure their safety from COVID-19 while they worked with members of the public.

## White Management Label Plaintiff "Aggressive" and Forbid Her from Sending Emails

95.     In or about late 2020 or early 2021, AVP Jones came to Plaintiff and informed her that she was no longer allowed to respond to group emails or to emails to external senders.

96.     Plaintiff was told that AVP Jones and Vice President Cindi Pagan ("VP Pagan")

17

had decided that she was far too "aggressive," and that she was "not allowed" to respond to inquiries, especially from County officials, and that AVP Jones would respond instead.

97.    Thereafter, Plaintiff was regularly stereotyped as the aggressive, angry Black woman even though she was just trying to do her job.  Meanwhile, Black employees who tried to avoid being portrayed as aggressive and angry and just kept their mouth shut were referred to as lazy and treated as if they did not care about their jobs.

### Defendant Changes to Half-Remote Due to Raging Covid but Still Forces Employees to go to Client Homes No Matter the Threat

98.    On or about December 2, 2020, Defendant Cayuga Centers updated its COVID-19 safety protocols and sent and updated policy to all staff.

99.    On or about December 2, 2020, Defendant Cayuga Centers updated its COVID-19 safety protocols and sent and updated policy to all staff.

100.    With COVID-19 cases starting to rise again across the country, Defendant Cayuga Centers was forced to move to two days a week in office and three days a week working from home. This was a policy decision from VP Pagan and upon information and belief, it was because Covid 19 was spreading so dangerously.

101.    Even though everyone knew that Covid infections were significantly rising, employees were still forced to meet with families in person, even though virtual options were available.  Even though social workers for Albany County had stopped face to face services in favor of safer, remote services, Defendant Cayuga Centers refused to do the same and continued to endanger its employees.

102.    Upon information and belief, Defendant Cayuga Centers did so because they made more money from in-person visits than remote visits.

18

**Plaintiff Asks Her Staff for Feedback Regarding Defendant Cayuga Centers' COVID-19 Safety Policy**

103.    On or about December 30, 2020, Plaintiff heeded the advice of CEO Hayes and asked her staff what suggestions, comments, or concerns they had regarding Defendant Cayuga Centers' policies regarding staff that worked off site, with members of the public, amidst the pandemic.

104.    Plaintiff's staff told her that they were concerned that the strict adherence to policies espoused by CEO Hayes were only for staff that worked in Defendant Cayuga Centers offices but did not apply to or protect staff members who worked in person with the public.

**Plaintiff Reports Her and Her Staff's Complaints to Upper Management**

105.    Plaintiff had a meeting with AVP Jones and reported her and her team's concerns to upper management, stating that she and her staff were concerned that the COVID-19 policies did not apply to staff that were working in the field and with members of the public.

106.    During the meeting with AVP Jones, Plaintiff also discussed her concerns about working in the field without any PPE and without any strict mask protections. Plaintiff highlighted that the strict adherence to safety and respect in the internal COVID-19 policies for Defendant Cayuga Centers offices should also apply for her and her staff who worked with members of the public.

107.    AVP Jones stated to Plaintiff that she needed to compile more detailed information from her staff about what their concerns were and what Defendant Cayuga Centers could do to ensure the safety of her team.

108.    Plaintiff reached out to her staff and solicited additional feedback about how they wanted to be treated in order to feel safe and secure in their public outreach and the work they continued to do for Defendants.

19

**Plaintiff's Direct Report LRC Bagdovitz Complaints to Management About the Lack of Safe and Compliant COVID-19 Policies**

109.    Plaintiff's staff reached out to her immediately and discussed their concerns with her about the in-person visits and help that they needed regarding Defendant Cayuga Center's COVID-19 policy.

110.    Plaintiff wanted to discuss this with management herself but some of her staff, so overwhelmed by the onslaught of COVID-19 cases within the community and prompted by the emails from CEO Hayes himself, reached out on their own accord to voice their concerns and ask questions and make suggestions.

111.    Concerned for his own health as well as the health of his family members, coworkers, and other clients, on December 30, 2020, Plaintiff's direct report LRC Bagdovitz emailed AVP Jones complaining of the continuous push for employees to do in-person services and the lack of comprehensive policies ensuring their safety:

> *"So what I'm hearing is there is no course of action set up by [Defendant Cayuga Centers] regarding our health concerns, only our families/clients. The new policy helps to reduce the risk we pose to each other in the office, but not the risk we face from entering the community on a daily basis which is the bigger of the two risk factors in my opinion. Are we going to be receiving hazard pay? I am ever increasingly concerned by everything that is going on within our state and how our company is responding to it."*

112.    In response, AVP Jones reiterated the same policy that Defendant Cayuga Centers has held since June 2020—that virtual meetings will only be approved if someone has been exposed to COVID-19.

113.    In a follow up email, LRC Bagdovitz told AVP Jones that it felt as though

Defendant Cayuga Centers was forcing its employees to make an impossible decision: take PTO, risk their health and potentially spread the virus, or quit.

**AVP Jones Instructs Plaintiff to Find an Excuse to Terminate LRC Bagdovitz Because of His Email Complaint About Defendant Cayuga Centers' Inadequate COVID-19 Safety Measures**

114.    Immediately after LRC Bagdovitz's email, AVP Jones started to retaliate against him for the complaints about the lack of COVID-19 protocols for employees that provided in-person home-based services in violation of state and local guidelines.

115.    Immediately after LRC Bagdovitz's email, AVP Jones started to retaliate against him for the complaints about the lack of COVID-19 protocols for employees that provided in-person home-based services in violation of state and local guidelines.

116.    AVP Jones told Plaintiff that she wanted LRC Bagdovitz terminated, that he was being "insubordinate" for putting his complaints in writing, and that Plaintiff should find an excuse for Defendant Cayuga Centers to fire him.

117.    Plaintiff responded to AVP Jones that she was not comfortable doing that. Plaintiff was shocked that AVP Jones cared so little about the health of the company's staff and clients and considered someone "insubordinate" for daring to complain about serious health risks caused by the company's policies.

118.    Soon after, AVP Jones tried to schedule a meeting with Plaintiff, LRC Bagdovitz, and VP Pagan. In an effort to postpone the unfair retaliatory termination of LRC Bagdovitz, Plaintiff took time off of work because she did not want to be part of unlawful mistreatment of the organization's employees.

119.    After Plaintiff expressed reluctance to fire LRC Bagdovitz for alerting AVP Jones to health concerns, especially in light of the emails from CEO Hayes requesting feedback and internal communications about safety protocols, AVP Jones backtracked and told Plaintiff that

21

LRC Bagdovitz was instead going to be terminated because of "lack of follow-through."

120. Plaintiff expressed her extreme reluctance to terminate LRC Bagdovitz, and told AVP Jones that if she wanted to terminate him for lack of follow-through, the entire team would be in jeopardy because follow through was not consistent across the board.

121. Upon information and belief, the termination of LRC Bagdovitz was temporarily stalled as AVP Jones got COVID-19 around that time and had to take time off work.

122. Upon information and belief, AVP Jones did not follow through with LRC Bagdovitz's termination because Plaintiff fought for him and refused to terminate him in retaliation for complaining about the lack of COVID-19 protocols.

### Plaintiff Passes Her Licensing Exam

123. On or about January 14, 2021, Charging Party passed her licensing exam for her social work degree.

124. After she passed her licensing exam, Charging Party began getting invited to meetings that included upper management.

### Defendant Cayuga Centers Admits it Needs In-Person Services for Financial Reasons

125. After passing the licensing exam, Plaintiff was invited to attend and participate in meetings with the upper management of the organization.

126. Plaintiff was shocked that the message at each of the meetings she attended was the same-Cayuga Center must push in person services for financial reasons.

127. Plaintiff was shocked to finally hear the real reason behind the lack of care for her and her staff, and distraught by the reckless disregard for her staff who were completing in-person visits amidst a global pandemic. Plaintiff was outraged that CEO Hayes regularly sent emails about COVID-19 safety protocols for staff in the offices, but he and other upper management continually pushed her and her team to see patients in person with no safety protocols and procedures because

22

Defendant Cayuga Centers wanted to make more money.

### Defendant Cayuga Centers' CEO Sends Company-Wide Email Blaming Employees' Social Lives for Positive COVID-19 Infections

128.    Throughout the pandemic CEO Hayes had been openly dismissive of employees' COVID-19 concerns. After being included in meetings with upper management, Plaintiff realized this was all a guise to cover up the fact that CEO Hayes just wanted to make more money by pushing in-person services.

129.    To add insult to injury, as employees got sick with COVID-19 due to the lack of appropriate safety measures by the organization, CEO Hayes sent out a company-wide email where he accused employees of getting the virus because they failed to practice social distancing outside of work hours when socializing with their friends.

### Plaintiff is Approached by her Team Due to their Sustained Concerns About Defendant Cayuga Centers' Dangerous Policies

130.    In or around January 2021, Plaintiff was approached by all four members of her team who panicked about giving in person services.

131.    Plaintiff's team members asked Plaintiff to contact VP Pagan and AVP Jones in an effort to relay their continued concerns about COVID-19 exposure/spreading via in-person interactions with clients and their concerns about Defendant Cayuga Centers' noncompliance with public health guidance.

132.    Plaintiff promised that she would relay their concerns to VP Pagan and AVP Jones.

### Plaintiff Reports Her Team's Complaints to AVP Jones and VP Pagan, Despite a Preconceived Fear that she Could be Subjected to Retaliation

133.    In or around mid-February 2021, Plaintiff had a meeting with VP Pagan and AVP Jones where they informed her about the organization's new efforts for more services to be provided in person instead of virtually and told Plaintiff that she should "push" her staff to provide

23

services in person. Plaintiff was surprised by this suggestion and stated that she and her staff did

not feel appreciated after hearing this suggestion by Defendant Cayuga Centers, and that she had

concerns to share.

134.    Plaintiff was already hesitant to bring up any concerns or voice her thoughts and

opinions, given Defendant often criticized and pushed back on thoughts and opinions of people of

color. Plaintiff was especially hesitant to bring up these concerns to VP Pagan and AVP Jones

because she had seen firsthand how they wanted to retaliate against LRC Bagdovitz, and how

readily they retaliated against employees who brought up safety issues to Defendant Cayuga

Centers upper management-especially employees of color.

135.    Plaintiff stated that she and her staff had continued concerns regarding Defendant

Cayuga Centers lack of policy to combat COVID-19 exposure when it came to employees

providing home-based services.

136.    VP Pagan and AVP Jones both assured Plaintiff that she could share her and her

team's specific concerns with them.

137.    Plaintiff was relieved to hear that her superiors were willing to hear out her team's

concerns and she told VP Pagan and AVP Jones that she would speak to her team and get back to

them about their specific concerns.

**Plaintiff Asks her Team to Share their Specific COVID-19 Safety Concerns with Her**

138.    On or around February 17, 2020, Plaintiff asked her team to share their exact

concerns with her regarding Covid safety issues at Defendant Cayuga Centers. Plaintiff also

assured her team members that their complaints would remain anonymous.

139.    In response to Plaintiff asking her team to share their concerns, LRC Gonzalez

responded:

24

> *"[Defendant Cayuga Centers]' COVID screening process is completely flawed and we need to do something in regards to an actual change with it because all the PPE that [Defendant Cayuga Centers] provides will not stop COVID-19 or our clients from constantly lying to us about their health and I refuse to put my loved ones in danger due to negligence on upper managements part...I do not feel support by upper management and [AVP Jones] at all. They misunderstand us constantly, talk down to us and assume we do not know what we are doing. It is demeaning."*

140. LRC Gonzalez also noted in her email that other agencies in the area recognized the risk and ceased sending their employees in the field out of concern for spreading COVID-19. Further, LRC Gonzalez voiced her disappointment that Defendant Cayuga Centers' CEO Hayes was blaming employee's personal lives for the COVID-19 outbreaks in the office.

141. LRC Bagdovitz responded that he, "echo[es] [LRC Gonzalez]'s sentiments." Additionally, he mentioned that Defendant Cayuga Centers employees should not have to rely on the judgement of their clients and should be able to make their own decisions regarding COVID-19 safety efforts.

142. HRC Moftah also echoed LRC Gonzalez and LRC Bagdovitz's concerns.

143. Plaintiff was overwhelmingly concerned that she and her colleagues would contract the virus when visiting clients' homes and spread it to the other mental health clients that they were required to visit each day. Given that there were no available vaccines for the general public at this time, Plaintiff and her staff feared the spread of the virus and the public health risks that it would cause.

144. On or about February 18, 2021, Plaintiff received three accidental texts from VP

25

Pagan. The texts read as follows: "Are you coming to consultation,? (sic). I'm gonna (sic) start attending karilles (sic) team meetings with staff. Did you hear how many sessions alex (sic) missed last week? Can you send me an invite."

145.     Upon information and belief, these texts were meant for AVP Jones.

146.     Upon information and belief, LRC Bagdovitz had missed in-person sessions with clients that he wanted to instead complete over Google Teams because of COVID-19 safety concerns.

147.     Upon information and belief, VP Pagan was furious that Plaintiff and her team were not billing for in-person meetings with clients because it would yield Defendant Cayuga Centers more money.

**Plaintiff is Terminated in Retaliation for Complaining About COVID-19 Protocols and For Being an Outspoken Black Woman**

148.     On or around Friday February 19, 2021, Plaintiff emailed her team's concerns to AVP Jones and VP Pagan.

149.     On or around Monday February 22, 2021, the very next business day Plaintiff was scheduled to work from home as part of the office's work from home policy's rotational schedule.

150.     Strangely, Plaintiff received a call from AVP Jones asking her if she was coming into the office.

151.     Plaintiff informed her that she was working from home that day.

152.     Shortly thereafter, Plaintiff received a call from Katie Nolan, Director of HR ("HR Nolan") for Defendant Cayuga Centers, informing her that she had been terminated for alleged "policy violation and poor judgement as a supervisor."

153.     Plaintiff asked HR Nolan multiple times which policy she had violated but did not receive a specific answer. Plaintiff followed up with an email to HR Nolan again asking to know

26

what policy she had violated and what had been "poor judgment" on her part.

154.    Plaintiff also stated in her email to HR Nolan that she believed that her termination was triggered by her February 19, 2021, email to AVP Jones and VP Pagan.

155.    Upon information and belief, Defendant Cayuga Centers considered it "poor judgement" to complain about a lack of COVID-19 safety policies posing a public health risk when it infringed on potential company profits.

156.    Upon information and belief, Defendant was especially quick to fire Plaintiff in retaliation for complaints of COVID-19 because she is a woman of color.

### **Plaintiff's Team is Outraged by her Termination**

157.    On or about February 22, 2021, Plaintiff reached out to her team on their personal cell phone numbers and told them that she had been terminated.

158.    Plaintiff received responses from her team, including but not limited to the following:

- "That's ridiculous honestly."

- "Karille, I genuinely don't know how to even continue doing this job or wanting to do this job if you aren't here."
- "That's ridiculous, I'm sorry Karille."

- "It's disgusting that everyone that has been terminated was people of color, while the ones who should've done (sic) terminated were able to leave in (sic) their own. I don't like that."
- "You were good to us and a breath of fresh air in this place."

- "They set up meetings for us to talk to cindi (sic) and Rhonda, best believe I'm going to make sure that during that meeting they know my concerns, they know you were a wonderful supervisor and I will explain to Cindi why I feel like Rhonda does not support us and what things she's said to me that make me not feel comfortable with her."

- "They said you put us in a difficult position by having us put things in a group email and it "should" have been done individually."

27

- "I said to them that this was very heartbreaking because you're the best supervisor I've ever had and you were always a support system for us."

- "You constantly provided us with a safe space and were a wonderful team leader."

- "I've thought about it and termination was definitely triggered by the email. After seeing the concerns and that some of them were directed at Rhonda she probably was embarrassed and took it out on you instead of looking in the mirror and saying "what would you guys like different.""

159.    Upon information and belief, Plaintiff was terminated for sending an email to her team and then to AVP Jones and VP Pagan detailing her and her team's COVID-19 related concerns about Defendant Cayuga Centers' lack of effective policies to protect employees who were forced to provide in person home-based services.

160.    Upon information and belief, Defendant Cayuga Centers actions wrought a devastating chilling impact on other employees. Defendant Cayuga Centers employees reasonably feared that if they made legitimate health and safety complaints about Defendant Cayuga Centers COVID-19 response, Defendant Cayuga Centers would retaliate against them as well.

161.    Upon information and belief, Defendant Cayuga Centers response to the COVID-19 pandemic remains inadequate, thereby putting their employees and clients at public health risk.

162.    Upon information and belief, Defendant Cayuga Centers continues to require employees to provide in person services even when there are signs of Covid-19 symptoms exhibited by the clients and/or their families.

163.    Upon information and belief, it is within the discretion of the Safety and Risk Director to allow employees not to go in person when any possible or confirmed exposure to COVID-19 occurs.

164.    Upon information and belief, there is still no mask directive for staff members

28

providing services to families in person.

## DEMAND FOR JULY TRIAL

165.    Plaintiff hereby demands a jury trial of each count of the complaint.

## AS AND FOR THE FIRST CAUSE OF ACTION
*(Retaliation in Violation of NYLL §740)*

166.    Plaintiff realleges and incorporates by reference each and every allegations in each and every aforementioned paragraph as if fully set forth herein.

167.    Plaintiff objected to and or refused to participate in an activity through her complaints to her superiors about Defendant Cayuga Centers failing to provide reasonable and adequate measures to protect the lives, health, and safety of its employees and clients, and had thus failed to comply with the laws, ruled, regulations, and/or regulatory guidance related to the COVID-19 pandemic. Plaintiff's complaints constituted protected complaints, objections, or refusals to participate under the NYLL.

168.    At the time of Plaintiff's complaints, Defendant Cayuga Centers response to the COVID-19 pandemic violated DOH's June 18, 2020, guidance for Home Care Services Regarding COVID-19, CDC, and/or additional federal, state, and local guidance, which constitute a law, rule, or regulation within the meaning of the NYLL.

169.    Additionally, Defendant Cayuga Centers' failure to comply with such law, rule, and/or regulation created and presented a substantial and specific danger to the public health.

170.    Because Plaintiff raised her concerns, objected to this activity, and demanded that her superiors take additional action to protect their employees and clients from COVID-19, she was terminated in violation of NYLL § 740.

171.    Plaintiff is entitled to backpay for Defendant Cayuga Centers violation of NYLL § 740.

29

Case 1:22-cv-07663-JHR   Document 1-1   Filed 09/08/22   Page 38 of 45

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Race and Gender Discrimination in Violation of the New York State Human Rights Law and the New York City Human Rights Law)*

172.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

173.   Defendant Cayuga Centers has discriminated against Plaintiff in violation of the New York State Human Rights Law and the New York City Human Rights Law subjecting her to different treatment on the basis of her race and gender. Plaintiff has suffered disparate treatment as a result of Defendant Cayuga Centers' wrongful conduct.

174.   Defendant Cayuga Centers has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white female and white male employees and by subjecting her to a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and other forms of discrimination on the basis of her race and gender in violation of the law.

175.   As a further direct and proximate result of Defendant Cayuga Centers' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

176.   Defendant Cayuga Centers' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

177.   By reason of Defendant Cayuga Centers' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York

30

City Human Rights Law as to Defendant Cayuga Centers. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Law
and the New York City Human Rights Law)*

178.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

179.   Plaintiff reported to her superiors that Defendant Cayuga Centers failed to provide reasonable and adequate measures to protect the lives, health, and safety of its employees and clients, and had thus failed to comply with the laws, rules, regulations, and/or regulatory guidance related to the COVID-19 pandemic.

180.   In retaliation, Defendant Cayuga Centers subjected Plaintiff to wrongful termination due to her reports of Defendant Cayuga Centers' failure to comply with the laws, rules, regulations, and/or regulatory guidance related to the COVID-19 pandemic and was quick to terminate Plaintiff due to her race.

181.   As a further direct and proximate result of Defendant Cayuga Centers' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

182.   Defendant Cayuga Centers' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

183.   As a result of Defendant Cayuga Centers' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost

31

benefits, other financial loss, and non-economic damages.

184.    By reason of Defendant Cayuga Centers' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act 29 U.S.C. §§ 206, et seq.)*

185.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

186.    The acts and practices of Defendant Cayuga Centers constitutes discrimination against Plaintiff in violation of the Equal Pay Act by unlawfully paying female employees less than male employees or those who were not of this status.

187.    At all relevant times, Defendant Cayuga Centers is an "employer" engaged in interstate commerce and/or in the production of goods for commerce.

188.    At all relevant times, Plaintiff was an employee and Defendant Cayuga Centers is an employer within the meaning of the Fair Labor Standards Act.

189.    At all relevant times, Defendant Cayuga Centers employed and/or continue to employ employees, including Plaintiff. At all relevant times, Defendant Cayuga Centers had gross operating revenues in excess of $500,000.00.

190.    Defendant Cayuga Centers was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

191.    Defendant Cayuga Centers' violations of the Equal Pay Act were willful and/or reckless, entitling Plaintiff to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

32

## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Unequal Pay in Violation of Article 6 of the New York State Equal Pay Act*
*Labor Law §§ 190, et seq)*

192.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

193.     At all relevant times, Plaintiff was an employee and Defendant Cayuga Centers was an employer within the meaning of the New York Labor Law.

194.     The acts and practices of Defendant Cayuga Centers constitute discrimination against Plaintiff in violation of the New York State Equal Pay Act by unlawfully paying Black employees and female employees less than male employees.

195.     Plaintiff's violations of the New York State Equal Pay Act were willful, entitling plaintiff to liquidated damages.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Race Discrimination in Violation of 42 U.S.C. § 1981)*

196.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

197.     Defendant Cayuga Centers has discriminated against Plaintiff in violation of 42 U.S.C. § 1981, by subjecting her to different treatment on the basis of her race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Cayuga Centers' wrongful conduct.

198.     Defendant Cayuga Centers has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated Caucasians and by subjecting her to disparate terms and conditions of employment, and other forms of discrimination on the basis of her race in violation of 42 U.S.C. § 1981.

33

199.    The conduct of Defendant Cayuga Centers was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

200.    By reason of Defendant Cayuga Centers' discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

201.    As a result of Defendant Cayuga Centers' violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $1,500,000.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Retaliation in Violation of 42 U.S.C. § 1981)*

202.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

203.    Plaintiff was an employee of Defendant Cayuga Centers and is protected by 42 U.S.C. § 1981 from retaliation and retaliatory discharge.

204.    Plaintiff complained to Defendant Cayuga Centers about the race discrimination she was subjected to during her employment with Defendant Cayuga Centers.

205.    Plaintiff's complaints were ignored and discouraged by Defendant Cayuga Centers.

206.    Plaintiff notified Defendant Cayuga Centers of the race discrimination she was subjected to and protested the harassment.

207.    Plaintiff's protest to Defendant Cayuga Centers about the race discrimination she was subjected to during her employment with Defendant Cayuga Centers was a protected activity under 42 U.S.C. § 1981.

208.    Defendant Cayuga Centers, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race discrimination.

209.    Because she protested Defendant Cayuga Centers' unlawful behavior, Plaintiff was

subjected to retaliation.

210.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of 42 U.S.C. § 1981.

211.    Defendant Cayuga Centers knew and should have known about the retaliation and the affect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

212.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due her.

213.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional distress.

214.    As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

215.    As a result of Defendant Cayuga Centers' violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $1,500,000.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(i)     On the First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined trial but in any case, no less than $1,500,000;

(iv)    On the Fourth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined trial but in any case, no less than $1,500,000;

(v)     On the Fifth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined trial but in any case, no less than $1,500,000;

(vi)    On the Sixth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined trial but in any case, no less than $1,500,000;

(vii)   On the Seventh Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined trial but in any case, no less than $1,500,000;

(viii)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

36

Dated: New York, New York
August 25, 2022

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Plaintiff*

By: */s/ Megan S. Goddard*
       Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, New York 10006
Office: 646-504-8363
Fax: 212-208-2914
Megan@goddardlawnyc.com

37